**THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| SW TECHNOLOGIES, formerly known as SHEN WEI USA INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) Court No. 23-00119 |
| UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

**COMPLAINT**

Plaintiff, SW Technologies, formerly known as Shen Wei USA Inc. (SW Technologies), by and through its attorneys, Sandler, Travis & Rosenberg, P.A., alleges as follows:

**PARTIES**

1.      SW Technologies is a privately owned business organized and existing under the laws of the State of California with its principal place of business located at 33278 Central Ave., Union City, CA, 94587.  SW Technologies is a world leader in the development, manufacture, and distribution of high-quality medical gloves. SW Technologies specializes in sustainable manufacturing and hand health technologies to provide premium protection in gloves that enhances performance for clinicians and their patients.

2.      The defendant in this case is the United States, through U.S. Customs and Border Protection (CBP or Customs). CBP is responsible for classifying merchandise imported into the United States under the Harmonized Tariff Schedule of the United States (HTSUS) and collecting duties on merchandise.

Court No. 23-00119

## THE SUBJECT ENTRIES AND PROTESTS

3.      This action challenges CBP's liquidation of five entries, Entry No. K8021058087, entered on September 4, 2019, and liquidated on August 14, 2020; Entry No. K8021058228, entered on September 4, 2019, and liquidated on August 14, 2020; Entry No. K8021061024, entered on September 11, 2019, and liquidated on August 14, 2020; Entry No. K8021061461, entered on September 11, 2019, and liquidated on August 14, 2020; and Entry No. K8021065348, entered on September 17, 2019, and liquidated on August 14, 2020 (collectively "The Entries").

4.      Protest No. 200621106118, challenging the liquidation of The Entries, was timely filed on February 9, 2021, and thereafter denied on March 1, 2023.

## JURISDICTION AND STANDING

5.       This action arises under 19 U.S.C. § 1514(a)(2), as amended, to contest CBP's classification with the associated duty rate, and amount of duties chargeable upon liquidation of SW Technologies' single use, powder-free, nitrile examination gloves (hereinafter "subject merchandise") as further described herein.

6.      This Court possesses exclusive jurisdiction over this action under 28 U.S.C. § 1581(a) as amended, because the action was commenced to contest the denial of a protest under Section 515 of the Tariff Act of 1930.

7.      In accordance with 28 U.S.C. § 2636(a), this action was timely commenced by the filing of a summons within 180 days after plaintiff's protest was denied.

8.      SW Technologies has standing to bring this action pursuant to 28 U.S.C. § 2631(a) because it is the importer of the subject merchandise and the party whose protest, filed under 19 U.S.C. § 1514, against the classification of such merchandise at liquidation was denied by Customs.

Court No. 23-00119

9.      All liquidated duties, taxes and fees were paid prior to commencement of this action.

## THE ASSESSMENT AND THE CLAIM

10.     At liquidation, CBP re-classified and assessed increased duties on the subject medical gloves under Subheading 4015.19.1010, HTSUS, which covers "[a]rticles of apparel and clothing accessories (including gloves, mittens, and mitts), for all purposes, of vulcanized rubber other than hard rubber: Gloves, mittens and mitts: Other: Other: Seamless, disposable" dutiable at a rate of 3 percent *ad valorem*.

11.     The subject merchandise are not classifiable under subheading 4015.19.1010, HTSUS, however, because they are medical gloves and medical gloves are specifically provided for in a preceding tariff provision, *eo nomine*, under Subheading 4015, HTSUS.

12.     The medical gloves are properly classified under Subheading 4015.19.0550, HTSUS, which provides for "[a]rticles of apparel and clothing accessories (including gloves, mittens, and mitts), for all purposes, of vulcanized rubber other than hard rubber: Gloves, mittens and mitts: Other: Medical, Other" which is duty free.

## BACKGROUND

13.     SW Technologies was established in 1984.

14.     For forty years SW Technologies has been synonymous with high quality medical gloves, developing its first medical glove in 1986.  Since that time Shen Wei has sought and received fifty-six 510k approvals related to medical gloves and currently offers sixteen medical glove styles.

15.     SW Technologies has spent in excess of a million dollars in research and development costs developing and improving its lineup of medical gloves.

Court No. 23-00119

16.     The medical gloves at issue include seven styles: Megaman (Item No. N260881), Steller S6 (Item No. N71688X), Aloeform Soft (Item No. N128402), Aloeform X6 (Item No N129401), Megaman Blue (Item No. N772355), Powerform X5+ (Item No. N02740X), and Hydrex (Item No. N106554).

17.     Medical gloves are Class I medical devices and, like all medical devices marketed and sold in the United States, are regulated by The Food and Drug Administration (FDA).  21 C.F.R § 860.3.

18.     Medical gloves are regulatorily identified as "non-powdered patient examination gloves" and are also known in the trade and regulatory landscape by other names including  patient examination gloves or exam gloves.  For ease of consistency in the foregoing, medical gloves, non-powdered patient examination gloves, patient examination gloves, and exam gloves are hereinafter referred to as "medical gloves" or "non-powdered patient examination gloves" interchangeably.

19.     Non-powdered patient examination gloves are relevantly defined by regulation as "a disposable device intended for medical purposes that [are] worn on the examiners hand or finger to prevent contamination between the patient and examiner." 21 C.F.R. § 880.6250.

20.     As explained by the FDA, medical gloves are critical to health and safety because they "prevent contamination and the spread of pathogens and can be the key barrier protecting against spreading infections." Fed. Reg. Vol. 86, No. 140 (July 26, 2021). Some medical gloves also "protect against occupational exposure, for example, to chemotherapy drugs." *Id.*

21.     Medical gloves are subject to rigorous quality standards not applicable to non-medical gloves including a prohibition against more than 2.5 defects per 100 gloves which is referred to as the "Acceptable Quality Limit."  21 C.F.R. § 800.20.

Court No. 23-00119

22.     In 2016, the FDA published a final rule banning powdered medical gloves based on the unreasonable and substantial risk of illness or injury to individuals exposed to the powdered gloves. FDA oversight over qualifying gloves remains active.

23.     Prior to the marketing, labeling, and sale of a glove as a medical glove in the United States, the glove must be cleared through the FDA's Premarket Notification process often referred to as the 510(k) process.  21 C.F.R.§ 807.92.

24.     The 510(k) process includes the submission of extensive information for FDA review.

25.     Each medical glove 510(k) submission is extremely comprehensive, can cover hundreds of pages of data, and cost tens of thousands of dollars to prepare. The submission must include detailed specifications and physical properties for the new glove, lab test reports demonstrating compliance with all required specifications, performance data, descriptions of the manufacturing process, product drawings, and packaging drawings with proposed labeling. *See* 21 C.F.R. §§ 807.88- 807.90.

26.     The FDA is tasked with reviewing 510(k) submissions and determining whether the glove under review is substantially equivalent to an identified glove that is currently being legally marketed in the United States as an examination glove. 21 C.F.R. § 807.100.

27.     If the FDA finds substantial equivalence, the FDA will "clear" the glove for marketing and sale in the United States as a medical glove.

28.     Before any new performance claims may legally be added to a cleared glove, such as protection from chemotherapy drugs or fentanyl, the FDA requires a new 510(k) submission be made and reviewed.

Court No. 23-00119

29.　　Marketing or sale of a glove as a medical glove in the United States without FDA clearance is strictly prohibited. See Guidance for Industry and FDA Staff, Medical Glove Guidance Manual at 28 (January 22, 2008) (FDA Medical Glove Manual).

30.　　Importers of medical gloves must register with the FDA.

31.　　Manufacturers of medical gloves must register with the FDA in processes known as "establishment registration."

32.　　Manufacturers of medical gloves must list their manufactured devices with the FDA and pay a fee in processes known as "device listing."

33.　　Prior to marketing and sale of a batch of medical gloves, each batch must be sampled and tested to ensure compliance with all relevant ASTM standards including the prohibition against more than 2.5 defects per 100 gloves. 21 C.F.R. § 800.20.

34.　　Medical gloves must be labeled in accordance with medical packaging regulations. 21 C.F.R. § 801.61.

35.　　When medical gloves are imported into the United States, in addition to providing CBP with entry documentation, the importer must also provide certain information to CBP directly for the FDA's review. This information includes the 510(k) number for the imported gloves, the registration number of the manufacturer, and the device listing number for the specific medical gloves.

36.　　The FDA reviews the provided information and is tasked with determining whether the gloves may be admitted into the United States as medical gloves.

37.　　If the FDA determines that the exam gloves are compliant, they issue what is known as a "May Proceed" which is communicated to CBP, the Customs broker and the importer.

Court No. 23-00119

38.     If the FDA determines that the gloves are not compliant, they will inform the

relevant parties that the gloves cannot be released into U.S. commerce as such; this noncompliant

determination may require CBP to issue a notice to the importer for the gloves to be redelivered to

CBP for export, destruction or in certain instances, repackaging/labeling as a non-medical glove

(a process known as reconditioning).

39.     CBP has historically recognized that the differences between medical and non-

medical gloves can be discerned by reference to the regulatory framework surrounding medical

gloves.  As far back as 2001, CBP explained that

> [a]ccording to the FDA, industrial use gloves are latex gloves that have failed
> [medical glove testing] or were not tested.  Manufacturers may then sell the
> untested, adulterated or leaky gloves to the cosmetic, food handling, electronic and
> other industries.  There are strict penalties for attempting to insert industrial use
> gloves into the medical use market because they are of differing quality.  (21 CFR
> 800.55).  The quality difference and marketing of these gloves, where the tear
> resistance of the article is specifically noted in the EN, distinguishes the surgical
> and medical use gloves from the non-medical use gloves.

HQ 964837 (May 2, 2001).

40.     Thereafter, in 2010, CBP again reiterated that

> [i]nformation on medical and non-medical gloves can be found on the FDA
> website.  In this regard, an FDA publication entitled "Guidance for Industry and
> FDA Staff, Medical Glove Guidance Manual" (Guidance Manual), issued on
> January 22, 2008, and hereinafter referred to as "The FDA Manual," is instructive.
> Medical gloves are medical devices subject to the general controls set forth in
> section 513(a)(1)(A) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.
> 360c(a)(1)(A).  By contrast, food service gloves are regulated by the Center for
> Food safety and Applied Nutrition and are not medical devices subject to a medical
> device pre-market review process and not cleared for marketing by FDA's Center
> for Devices and Radiological Health.

HQ H026663 (September 2, 2010).

41.     SW Technologies properly entered the subject merchandise as an FDA controlled

medical device and classified them as medical gloves under Subheading 4015.19.0550, HTSUS.

Court No. 23-00119

42.     On August 10, 2020, without explanation, CBP issued a Customs Form 29 Notice of Action notifying SW Technologies that CBP had rate advanced the subject entries under Subheading 4015.19.1010, HTSUS, under the basket provision "other".

**CAUSE OF ACTION**

**COUNT I- THE SUBJECT MERCHANDISE ARE CLASSIFIABLE UNDER SUBHEADING 4015.19.0550, HTSUS**

43.     Plaintiff hereby incorporates and alleges paragraphs 1 through 42 as if fully set forth here.

44.     Merchandise imported into the United States is classified under the HTSUS. Tariff classification is governed by the principles set forth in the General Rules of Interpretation (GRI) and, in the absence of special language or a context that requires otherwise, by the Additional U.S. Rules of Interpretation.

45.     "The GRIs are to be applied in numerical order, such that if the proper classification is achieved through a particular GRI, the remaining successive GRIs should not be considered." *Starkist Co., v. United States*, 2022 WL 945663 (Fed. Cir. 2022).

46.     GRI 1 of the HTSUS states, in relevant part, that "classification shall be determined according to the terms of the headings and any relevant section or chapter notes" and requires that classification be determined first according to the terms of the HTSUS headings and any relative section or chapter notes.

47.     Absent contrary legislative intent, tariff terms are to be construed according to their common meaning and commercial meaning which are presumed to be the same. *Starkist Co., v. United States*, 2022 WL 945663 (Fed. Cir. 2022).

Court No. 23-00119

48.    When interpreting tariff terms in the HTSUS, the court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Carl Zeiss, Inc. v. U.S.*, 195 F.3d, 1375,1379 (*citing Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999)).

49.    The common meaning of medical glove is "a disposable device intended for medical purposes that [are] worn on the examiners hand or finger to prevent contamination between the patient and examiner." 21 C.F.R. § 880.6250.

50.    Each one of the styles at issue consists of a disposable device, intended for medical purposes, and is worn on an individual's hand to prevent contamination.

51.    Each one of the styles at issue was cleared for marketing and sale in the United States as a medical glove by the FDA following the FDA's review of the 510(k) submissions.

52.    Because SW Technology added Fentanyl and chemotherapy resistance claims to the Megaman gloves and low dermatitis potential to each of the models at issue following the original 510(k) clearances, SW Technologies was required to submit additional 510(k) submissions along with further laboratory testing to the FDA. The FDA once again vetted the submissions and cleared the gloves for marketing and sale as medical gloves with the new claims.

53.    Each one of the styles at issue was and is duly listed with the FDA and has an assigned a device number.

54.    SW Technologies was and is duly registered with the FDA as an importer/distributor of medical devices and included amongst its device listings, are each of the styles at issue.

Court No. 23-00119

55.     The manufacturers of each style at issue were Duly registered as medical device manufacturers with the FDA throughout the production and entry of the subject gloves and had duly listed the gloves at issue.

56.     Each style at issue meets or exceeds all quality requirements for medical gloves marketed and sold in the United States.

57.     The manufacturers produced the subject gloves to be powder free in compliance with the ban on powdered patient examination gloves.

58.     As required by ASTM D6319, each style at issue was sampled, inspected, and tested prior to shipment to the United States. This time consuming and expensive process included visual inspections, functional inspections, leak tests, dimensional tests, and tensile strength tests.

59.     The packaging for each style at issue was labeled in accordance with all applicable medical glove labeling regulations including being labeled as "single use" and "powder free nitrile examination gloves."

60.     SW Technologies entered the subject merchandise under Subheading 4015.19.0550, HTSUS, the tariff provision for medical gloves.

61.     At entry, the gloves were duly identified under the FDA code for patient exam gloves specifically, 80L-ZA.

62.     At entry, the declaration of intent code was input identifying the gloves as intended for medical uses (081.001) with a program code "DEV" for medical devices. Such an entry was then flagged as "Partner Government Agency (PGA) FD2" which identified the entry as containing merchandise subject to mandatory FDA review.

63.     At entry, for each glove style at issue, the FDA was duly provided with the device listing number, the manufacturers registration numbers, and the 510(k) number.

Court No. 23-00119

64.     Each glove was issued a "may proceed" as a medical glove by the FDA.

65.     Accordingly, the medical gloves at issue are classifiable under Subheading

4015.19.0550, HTSUS, and SW Technologies is entitled to a refund of all unlawful duties assessed

and paid, together with all applicable interest.

**REQUEST FOR JUDGMENT AND RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment overruling

the Port Director's denial of Plaintiff's protests and ordering Customs to reliquidate the subject

entries at the rate, origin, value, and amount of duty asserted by the importer of record in its protest

with a refund of duties, plus interest as appropriate. Plaintiff also requests such other and further

relief as the Court deems appropriate and just.

Respectfully submitted,

**SANDLER, TRAVIS & ROSENBERG, P.A.**
*Attorneys for Plaintiff*
675 Third Avenue, Suite 2425
New York, New York 10017
Telephone: (212) 549-0137

By:    /s/ Jason M. Kenner
        JASON M. KENNER
        AMANDA K. LEVITT

Dated: May 22, 2024
        New York, New York